THE VILLAGE OF PAWNEE, Plaintiff-Appellant and Cross-Appellee, v. AZZARELLI CONSTRUCTION COMPANY *et al.*, Defendants-Appellees and Cross-Appellants (Azzarelli Construction Company, Third-Party Plaintiff and Cross-Appellant; Robert A. Williams Construction Company, Inc., Third-Party Defendant and Cross-Appellee).

Fourth District No. 4—88—0470

Opinion filed June 1, 1989.

1000

John M. Myers and Robert E. Wagner, both of Pfeifer & Kelty, P.C., of Springfield, for appellant.

Edward F. Casey, of Casey & Casey, P.C., of Springfield, for appellee Azzarelli Construction Company.

David W. Kash, of McNeela & Griffin, Ltd., of Chicago, for appellee Fidelity & Deposit Company of Maryland.

JUSTICE LUND delivered the opinion of the court:

Plaintiff Village of Pawnee (plaintiff or Pawnee) filed a fourth-amended complaint against defendants Azzarelli Construction Co. (Azzarelli) and Fidelity & Deposit Company of Maryland (Fidelity) seeking damages in excess of $1 million. Plaintiff alleged various theories of recovery for a sanitary sewer system, which Azzarelli constructed

for plaintiff, but which was found to have excessive amounts of water passing through the system. Fidelity is Azzarelli's surety by virtue of a performance bond executed between the two parties. The causes of action were narrowed down by rulings of the circuit court of Sangamon County until only a breach of contract claim remained. The jury found liability against defendants on this claim, but awarded damages of only $35,379. Plaintiff appeals, and defendants filed cross-appeals. We affirm.

Plaintiff has alleged numerous errors in its appeal, while defendants have alleged but a few. Because of our holdings below, we can consolidate the issues into the following outline: (1) whether a directed verdict should have been granted plaintiff on the affirmative defense of waiver by inspection and acceptance; (2) whether the burden of proof instruction was contradictory, and also gave an insufficient description of the principle of law regarding latent defects; (3) whether the court abused its discretion in refusing plaintiff's jury instruction on damages, and whether the damage award of $35,379 was clearly inadequate; (4) whether plaintiff should have been granted directed verdicts as to Azzarelli's remaining affirmative defenses; (5) whether the court erred in eliminating plaintiff's claims for breach of fiduciary duties, conspiracy to breach fiduciary duties, common law fraud, and fraud under the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1987, ch. 121½, pars. 261 through 272); and (6) whether the court erred in allowing plaintiff's engineering expert to be cross-examined concerning sources of government funding for his engineering services. Initially, we deal with a motion filed by plaintiff to strike Azzarelli's statement of facts contained in its appellate brief. We ordered the motion taken with the case, and we now deny the motion.

On February 8, 1971, plaintiff and the consulting engineering firm of George H. Knostman, Jr., and Associates entered into a contract whereby the engineering firm would design plans for a sanitary sewer system for plaintiff and would supervise the construction of the system. Knostman prepared the plans. Plaintiff then executed a contract with Azzarelli on May 8, 1972, to construct the system. The system consisted of approximately 14 miles of sewer pipes, 234 manholes, 4 pumping fixtures called lift stations, and a sewage treatment plant. Azzarelli subcontracted the construction of the sewage treatment plant to Robert A. Williams Construction Company, Inc. (Williams). Azzarelli brought Williams into the litigation as a third-party defendant. Williams was dismissed from the suit at the close of plaintiff's case, and plaintiff has abandoned any claim for damages concerning

work subcontracted to Williams.

Azzarelli was paid $785,871.76 for the project, and final payment was made on September 9, 1974. Plaintiff claimed that the system was fraught with defects and that it first became aware of the defects in February 1979.

Plaintiff filed its initial complaint on October 2, 1979. At one point in the ensuing litigation, plaintiff refused to supply Azzarelli with a bill of particulars. The circuit court ordered plaintiff's claims against Azzarelli dismissed with prejudice but, on appeal, this court reversed. (*Village of Pawnee v. Knostman* (1983), 115 Ill. App. 3d 842, 450 N.E.2d 1272.) The cause was remanded to the circuit court for milder sanctions against plaintiff and for further proceedings in litigation.

On May 24, 1985, the court allowed plaintiff to file a fourth-amended complaint. The complaint contained nine counts. Counts I and II were claims against Knostman for breach of contract and negligence, respectively. Count III alleged Azzarelli constructed the sanitary sewer system in a defective manner in breach of its contract with plaintiff. Count IV alleged breach of fiduciary duties against Knostman and Azzarelli. Knostman, as plaintiff's agent, allegedly submitted false payment estimates to plaintiff for progress payments to be made to Azzarelli. Plaintiff accused Knostman of violating representations that the progress of the construction had been inspected and that the work was acceptable as of the date of each estimate. Azzarelli had also signed the estimates. Count V alleged fraud, and count VI alleged conspiracy to defraud and to breach fiduciary duties by Knostman and Azzarelli based on the same false payment estimates. Count VII alleged the submission of false payment estimates was a violation of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1987, ch. 121½, pars. 261 through 272). Count VIII alleged wilful and wanton conduct by Knostman and Azzarelli. Count IX was a claim against Fidelity based on its performance bond. Following motions to dismiss by Azzarelli and Knostman, the court dismissed count VII. Count VIII was later ordered stricken, without objection from plaintiff. Plaintiff makes no argument concerning count VIII in this appeal.

Azzarelli responded to count III, plaintiff's claim for breach of contract, by alleging several affirmative defenses. The three relevant affirmative defenses are as follows:

*"Affirmative Defense I*

1. Plaintiff, pursuant to the parties' contract, appointed and designated George H. Knostman, Jr., defendant, as its engineer

and agent to inspect the performance of this defendant and authorized him to waive any deficiencies therein and to accept this defendant's performance on behalf of plaintiff.

2. Said George H. Knostman, Jr., inspected this defendant's performance as it progressed and was fully informed as to the nature and quality of this defendant's performance.

3. Said George H. Knostman, Jr., as plaintiff's duly authorized agent, accepted defendant's performance and waived any deficiency therein."

*"Affirmative Defense V*

1. Article 33 of the parties' written contract required plaintiff to notify this defendant of all work and materials condemned by its engineer as failing to conform to the contract and afford this defendant a reasonable time within which to replace and re-execute this defendant's work according to such contract without expense to plaintiff. Without notice to this defendant and prior to the filing of the original complaint, the plaintiff with respect to conditions it now contends to be breaches of this defendant's duties under the such [*sic*] contract, did the following:

 a. Abandoned and dismantled the sand filters installed at the treatment plant;

 b. Removed a water line from a sanitary sewer line and repaired both lines;

 c. Repaired various joints of pipe of the sanitary sewer line;

 d. Repaired leaks in the dikes of lagoons of the treatment plant;

 e. Repaired leaks in air piping and diffusers installed in the lagoons of the treatment plant.

2. Plaintiff's above-described actions prevented this defendant from investigating the alleged defective work and material and replacing and re-executing any that in fact failed to conform to the parties' contract. Plaintiff thereby waived, and is estopped to make, any claim for damages with respect to any of the above conditions.

*Affirmative Defense VI*

1. The allegations of paragraph 1 of Affirmative Defense V are adopted as the allegation of Paragraph 1 of this Affirmative Defense.

2. Plaintiff's above-described actions prevented this defendant from investigating the alleged defective work and material

and replacing and re-executing any that in fact failed to conform to the parties' contract. Plaintiff thereby failed to mitigate its damages with respect to any of the above conditions."

On January 6, 1988, plaintiff and Knostman filed a stipulation stating all claims against Knostman had been settled and asking that the causes of action against Knostman be dismissed. The court granted the motion.

The trial began on March 7, 1988, and lasted 15 days. The basis of the lawsuit was an excessive amount of water flowing through plaintiff's sanitary sewer system. In engineering parlance, the problem is described as infiltration and inflow. At its worst moments, usually during flooding, the sewage treatment plant had been unable to filter the excessive water flow and had broken down or was shut down in order to spare the inevitable. The sewer system backed up, and raw sewage would overflow into two nearby branches of the Sangamon River. Needless to say, the overflowing sewage system concerned the citizens of Pawnee, as well as government agencies, such as the Illinois Environmental Protection Agency (IEPA). The focus of the trial was on Azzarelli's responsibility for the excessive water flow. In all, six engineering professionals testified at the trial, assigning the defects in the sewer system to various causes. Simply stated, the evidence was vigorously disputed as to the quality of Azzarelli's workmanship.

Plaintiff called George Knostman as a witness. Knostman testified that he is a professional engineer. He designed the sewer system and treatment plant for plaintiff, and then supervised and inspected Azzarelli's performance of the construction. The construction of the sewer system started in the spring of 1972. It was substantially completed by the spring of 1973. As the job progressed, payments were made to Azzarelli in accordance with periodic pay estimates. Knostman prepared the pay estimates and submitted them to plaintiff's village board. The final pay estimate contained an implied representation that the work had been completed and performed in a satisfactory manner. According to Knostman, in September 1974, there was no problem with excessive water entering the sewer system. The lift stations could not even be tested because of a lack of water flow. All of the sewer lines were checked for alignment. Knostman made no test for infiltration, as prescribed by the contract, because the residents of Pawnee had connected up to the sewer system during construction, and this prevented an accurate test of the system by itself. Knostman did notice problems with infiltration and inflow as early as February 1975. Knostman and Azzarelli attempted to find the

source of the excessive water flow prior to Knostman's departure as city engineer in 1977. However, Knostman could not arrive at a determination.

On cross-examination, Knostman explained the difference between inflow and infiltration. Inflow is a sudden, heavy flow of extraneous or storm water, which enters the sanitary sewer by way of a normal opening or connection. Infiltration is ground water that seeps through cracks in sewer pipes and manholes. It is impossible to make a sanitary sewer system perfectly watertight. The goal is to make the sanitary sewer system as watertight as possible. The original specifications for the Pawnee project allowed for an excess flow of 20,000 to 22,000 gallons per day for the system.

Knostman was on the job daily during construction. He and two others inspected all the work of Azzarelli. Knostman observed the manholes being installed and stated they were constructed properly. During the summer of 1973, he examined all of the sewer lines and measured the distances between manholes. In certain cases, the manholes were not aligned as he had originally planned them. However, this was usually because of a deviation made during construction to accommodate utilities in the ground. According to Knostman, the utilities in Pawnee belong to plaintiff, and any relocation of utilities would have been at plaintiff's expense. Knostman considered the final payment estimate as a written statement that the work was acceptable. The final estimate was prepared in April 1974 after inspection of the entire system in preparation of a list of deficiencies. Azzarelli returned twice to correct the deficiencies, and Knostman was told by the city employees that the system was satisfactory. Knostman gave his opinion that plaintiff received the system Knostman designed and Azzarelli was entitled to payment in full. Knostman was satisfied that no construction defects were causing the excessive infiltration and inflow problems in Pawnee. Knostman stated that poorly installed residential and commercial service connections could be the source of the problem.

During the construction of the sanitary sewer, Knostman recalled a point where the path of the sanitary sewer intersected with a storm sewer. It was Knostman's opinion that plaintiff would have to pay to remove the conflicting storm sewer, which would cost between $2,500 and $5,000. As an alternative, Azzarelli agreed to install a temporary "running trap" at no cost to plaintiff. Following construction of the running trap, Knostman tested this portion of the sanitary sewer to see if storm water was entering the system. Knostman concluded that the trap was properly constructed and no excessive leaks were

present. Pawnee is a town which is subject to mine subsidence. After the project was completed, Knostman noted that certain manholes were six to seven inches below their original elevation when installed.

Robert Rape, a village employee, who had worked under Knostman's supervision, testified for plaintiff. Rape was plaintiff's superintendent of utilities from 1972 until 1974, and he had three employees in his department. During construction of the sanitary sewers, the utility department marked the utilities for Azzarelli's crews. On several occasions, Rape observed Azzarelli crews tamping fill with their feet after the backhoe had overdug the depth of the sewer trench. He also saw sewer pipes move when dirt was backfilled into the trench. Rape testified that some of the pipes appeared to separate during backfilling. After the sewers and manholes had been installed in 1973, Rape and his employees inspected all the manholes. Rape testified that out of approximately 250 manholes constructed, 80% of them were leaking. Rape made a list of the leaks and other defects, and the list was furnished to Azzarelli for correction. Azzarelli's crew came back in 1973 and made repairs to the defects noted on Rape's list. Rape reinspected the manholes after the repairs by Azzarelli in 1973 and still found defects. Rape gave his opinion that approximately one-half of the defects had been corrected. Azzarelli sent back a second crew of workmen to make additional repairs in 1974.

Knostman prepared a map of Pawnee marking the "T" and "Y" pipes installed by Azzarelli for the residential and commercial service connections to be made to the sewer system. Rape estimated that he observed some 200 to 300 of these lateral connections. Occasionally, the residents did not use the "T" or "Y" connections because the connections were not in the locations shown on the map, or the connections were facing the wrong direction. In those cases, the residents broke into the sewer pipe to make their sewer connection. On four or five occasions, Rape recalled that lift station No. 2, the pumping station nearest the creeks, had flooded because of excess groundwater in the sewer system.

Two other engineers testified for plaintiff. Edward Campbell was plaintiff's city engineer from 1977 until 1982. He had previously worked for the IEPA for several years. Before becoming plaintiff's engineer, he had established his own consulting engineering firm. Campbell testified that he was originally hired by plaintiff to conduct a study of plaintiff's sanitary sewer system. Although he never completed the study, he conducted several tests of the system. Campbell supervised television examinations of portions of the sewer system in 1978 and 1979. He also excavated some of the pipes and examined

them personally. Campbell found several defects in the construction of the sewer pipes. He inspected the running trap, and he testified that water was flowing directly from the storm sewer into the lower sanitary sewer. He testified that he inspected the majority of the manholes and gave his opinion that they had been improperly constructed. Campbell gave his opinion that most of the problems in defects were caused by poor workmanship on the part of Azzarelli.

Campbell made a series of studies of the water flow through plaintiff's sewer system between the years 1977 and 1981. According to Campbell, the system showed a problem with excessive inflow and infiltration. His studies found no correlation between inflow and infiltration in the sanitary sewer's various subsystems and the number of residential service connections present. However, he gave his opinion that, perhaps, 25% of the excess water flow problem was as a result of sloppy service connections.

On cross-examination, Campbell stated that plaintiff had added nearly 2 miles to the 14 miles of sanitary sewer constructed by Azzarelli. Further, the amount of pipe involved in the lateral connections to residences and commercial buildings could be as high as 8 to 12 miles. Campbell acknowledged that portions of Pawnee have a history of flooding.

The third engineer to testify for plaintiff was Nathan Wilcoxon. Wilcoxon was employed by Crawford, Murphy & Tilly, a consulting engineering firm. Wilcoxon and the firm replaced Campbell in 1982 as the city's engineers. Wilcoxon prepared a sanitary sewer evaluation study, which was required of every municipality by the IEPA. As part of this report, flow studies were conducted in 1983 and 1984. The flow study showed there was excessive water flow in the system. Television surveys were again used to inspect portions of the system. Wilcoxon testified the surveys disclosed a number of open joints. Wilcoxon had the running trap removed at a cost of $11,000. During this removal, he observed several defects in the pipes and joints in or near the running trap. It was Wilcoxon's opinion that the running trap had been improperly constructed.

The studies also examined the manholes. The manholes showed defects. The connections between the sewer pipes and the manholes were not completely sealed in some cases, and there were also cracks visible. As a result of these findings, plaintiff repaired several manholes with help from government funds.

Wilcoxon gave his opinion that it was impractical to repair the manholes and sanitary sewer pipes. He believed that a relief sewer was required to supplement certain portions of the existing sewer.

Over objection, Wilcoxon testified that the estimated cost of such a relief sewer was $778,000. Further, repair work performed to the manholes and other recommended repairs would cost a total of $162,850. The sanitary sewer evaluation study cost $70,000 in engineering fees.

Wilcoxon gave his opinion as to the effect residential connections had on the excessive water flow problem. Wilcoxon based his opinion on tests performed by independent companies, such as the one which made the television survey. Wilcoxon's opinion was that residential connections were only a minor contributor to the problem.

On cross-examination, Wilcoxon stated the 1984 repair work performed on the manholes involved principally the replacement of manhole lids with watertight lids and raising the elevation of the tops of the manholes. Prior to 1982, when Wilcoxon replaced Campbell as plaintiff's city engineer, plaintiff had spent only $1,500 in the maintenance of its sanitary sewer system. After 1982, Pawnee spent some $38,000 rehabilitating manholes, and $11,000 removing the running trap. However, much of the cost could have been considered as changes in design rather than strictly repairs.

In connection with his proposed relief sewer, Wilcoxon stated his replacement for lift station No. 2 would cost $150,000, as opposed to the $10,000 paid to Azzarelli in the early 1970's. Wilcoxon proposed to increase the capacity of lift station No. 2 from 360,000 gallons per day to 2,100,000 gallons per day.

Wilcoxon gave his opinion that 75% of the excessive infiltration and inflow came from the sewer system itself, while 25% came from residential and commercial service connections. However, a study he published in 1979 suggested that residential service connections and footing drains were major contributors to infiltration and inflow problems in municipal sewer systems. Wilcoxon acknowledged that one television inspection of a portion of plaintiff's sewer system showed that one-half of the sanitary sewer pipe required no maintenance at all, and that the major cause of leaks throughout the other one-half stemmed from residential connections.

Wilcoxon conceded that the IEPA does not reimburse municipalities for rehabilitation of residential service connections. The IEPA does not fund work performed on private property. Wilcoxon did not perform any tests to determine the correct percentage of infiltration and inflow coming from residential service connections. He acknowledged his opinion that 25% of the problem was attributable to service connections was just an estimate based on his examination of other studies.

Included among the exhibits admitted into evidence were invoices for repairs made, and projected costs for anticipated repairs, including the cost of the relief sewer. Plaintiff then rested. Defendants moved for directed verdicts on all counts against them. The court directed verdicts on the three counts of fraud, counts IV, V, and VI. All that remained was a claim for breach of contract.

The jury heard testimony from three of Azzarelli's job superintendents. Vito Fantozzi was the first superintendent assigned by Azzarelli to the Pawnee project. Fantozzi began his work in Pawnee in May 1972 by meeting with Knostman. Knostman laid out the job and furnished the grades for the installation of the sanitary sewer project. During the course of the project, Knostman changed the location of the sewer line. Fantozzi followed Knostman's directions regarding the placement of the sewer line. He stated that Knostman was a demanding engineer. Knostman was on the job daily and checked the pipes for cracks before installation. Later, on cross-examination, Fantozzi acknowledged that Knostman could not check every pipe because there were four crews working at the same time and, at certain times, they were separated by long distances.

Fantozzi described the installation of the sewer pipes and the construction of the manholes. Fantozzi gave his opinion that all of the manholes were constructed in a workmanlike manner. All of the sewer pipes were checked to make sure they were at the required depth, and then the connection was checked to assure a watertight joint.

Testimony was heard from Earl Hilgert by way of evidence deposition. Hilgert became job superintendent in early 1973 and continued in that capacity until the project was completed. Hilgert stated that the payment estimates were prepared by Knostman and then approved by the village board. After the approval, the checks were given to Hilgert to sign on behalf of Azzarelli. Hilgert had no role in preparing the pay estimates except for the last one. Hilgert stated that the work was performed according to the plans and specifications, and that plaintiff accepted the work. A thorough inspection was made of the entire system prior to preparation of the final pay estimate. At that time, there were still some deficiencies. A list of the deficiencies, called a "punch list," was prepared. Azzarelli corrected everything on the punch list. After the final payment was made, Hilgert returned because of complaints concerning lift station No. 2. When the nearby creek flooded, so did lift station No. 2. Repairs were made, and Azzarelli reimbursed plaintiff in order to fulfill its one-year guarantee. After completion of the project, Hilgert performed some of

his own tests, and the infiltration level was found to be within the limits allowed by the contract.

Charles Simmons, Azzarelli's general superintendent, also testified. Simmons' only involvement in the Pawnee project came with the return trips made by Azzarelli to correct deficiencies after the completion of the project. The punch list was prepared by Knostman and Robert Rape. Simmons supervised the correction of the deficiencies mentioned on the punch list during the winter of 1974. Robert Rape and two trustees of Pawnee's village board inspected the additional work done by Azzarelli. After the repairs were made, Simmons attended a meeting of the Pawnee village board, where the final pay estimate was approved. The board stated they accepted the performance of Azzarelli. Hilgert returned in May 1975 to make further corrections. After that time, Azzarelli heard nothing from plaintiff regarding any deficiencies until October 1979.

In September 1984, Simmons and others made an inspection of the sewer system and the treatment plant in preparation for litigation. Simmons gave his opinion that the manholes he inspected looked normal for having 12 years' wear and tear. The deficiencies that he found appeared to be from lack of maintenance. Simmons stated that manholes do require maintenance.

Azzarelli presented the testimony of Richard Zeller, president of Jo Mar Television. The business of Jo Mar is the television inspection of sewer lines. In 1987, at Azzarelli's request, Zeller reviewed videotapes of plaintiff's sanitary sewer system made by other firms. Zeller viewed four tapes made in 1985. Based on the television survey, Zeller gave his opinion that the sewer pipe was structurally sound. Of four cracked pipes he observed on the tapes, two were at residential service connections. There were 63 instances of observed infiltration. However, the majority, 52, were from residential service connections. Zeller also viewed seven tapes made in 1978 and 1979. Again, the majority of infiltration was observed at service connections.

Azzarelli read to the jury certain interrogatories answered by plaintiff, stating that the western portion of Pawnee covers an area that has been mined, and that mine subsidence has occurred within Pawnee. Pawnee does not have a record of floods to which it was subject prior to April 1983. However, in the years 1983 and 1984, Pawnee was flooded on a number of occasions.

Timothy Kluge, a chemical engineer employed by the IEPA, testified for Azzarelli. Kluge testified that the treatment plant and sewer system in Pawnee were built in accordance with approved plans and specifications. The design of the Pawnee system was to handle an av-

erage flow of 300,000 gallons per day in average dry conditions. In 1976, Kluge made an inspection of plaintiff's entire sewer system. At that time, he noted no problem with infiltration, except along a portion of the system which crossed underneath a creek. At that time, too, there were no reports of basement backups or sewer overflows. On cross-examination, Kluge stated that from 1976 and on into the 1980's, the IEPA was aware of, and concerned about, infiltration and inflow problems in Pawnee.

Azzarelli called Robert Caldwell, a professional engineer, as an expert witness. Caldwell has been employed as a consulting and a construction engineer. He has designed and supervised the construction of sanitary sewer systems. In 1984, he was engaged by Azzarelli to serve as a consultant and possible witness at trial. In September 1984, he and several representatives from Azzarelli made an inspection of the manholes in Pawnee prior to their rehabilitation. Caldwell gave his opinion that the deficiencies he observed in the manholes were attributed mainly to lack of maintenance.

In preparation for trial, Caldwell reviewed the television inspections conducted in 1978 and 1979. He reviewed an independent study made in 1976, and also the studies prepared by Campbell and Wilcoxon. He reviewed IEPA records and various other reports concerning the project. Caldwell gave his opinion that Azzarelli's performance of the construction contract was completed in a workmanlike manner and complied with the plans and specifications. It was Caldwell's opinion that the source of the excessive water flow in plaintiff's sewer system was the residential service connections and footing drains. Caldwell stated the relief sewer proposed by Wilcoxon was not really a repair to the existing system, but an expansion into an entirely new system.

Caldwell gave his opinion that lift station No. 2, and the manholes and sewer pipes in the immediate area, were adversely affected by the repeated flooding to which they were subjected. Lift station No. 2 is in the vicinity of two creeks, and Caldwell gave his opinion that placing lift station No. 2 in that location was a design error.

Fidelity called only one witness, Dr. Ashok Lagvankar. Lagvankar is an engineer and was employed by Fidelity to serve as a consultant and expert witness in the litigation. In preparation for trial, he also reviewed the television inspection videotapes, the contract documents, plans, specifications, and the various reports prepared by the other professionals. He made a personal visit to Pawnee in October 1986. During this visit, he inspected a number of manholes, which were identified as not having been rehabilitated. Lagvankar's opinion was

that the original construction was sound. However, he noted that the placement of the manholes was poor since many were placed in ditches and depressions, which permitted the inflow of surface runoff. Lift station No. 2 appeared to be located in a flood plain. Lagvankar gave his opinion that the pipes in the sewer system were 99% structurally sound. Lagvankar also believed that the excessive water flow in Pawnee was caused by sloppy residential service connections. In Lagvankar's opinion, 80% to 90% of the problem was coming from the private sector and manhole covers. Yet, he stated that the manholes he reviewed were constructed in a workmanlike manner.

Instructions were then tendered by the parties. The court was dissatisfied with several instructions proposed by plaintiff. Three instructions were proposed concerning the affirmative defense of waiver by acceptance. The circuit court rejected all of plaintiff's proposed instructions on this matter. Related to this, the circuit court rejected plaintiff's version of the burden of proof instruction and drafted its own, which was given to the jury. The court also rejected plaintiff's instruction on damages and drafted its own. All of Azzarelli's instructions were refused. The jury returned a verdict for plaintiff in the amount of $35,379.

### WAIVER

Plaintiff initially argues the trial court erred in denying plaintiff a directed verdict concerning Azzarelli's affirmative defense of waiver by acceptance. Plaintiff argues the fact the jury was allowed to consider the affirmative defense probably resulted in a low jury award. Plaintiff suggests that, despite a finding of liability in plaintiff's favor, the jury may have declined to award damages for defects in the sewer system which Knostman accepted. Defendants respond that the contract gave Knostman the authority to inspect and improve the construction work on behalf of plaintiff. Defendants argue plaintiff waived all but latent defects because it was bound by Knostman's acceptance.

The conflict centers on the language of the contract. The relevant provisions of the contract are as follows:

"14. RESPONSIBILITY OF THE ENGINEER. The term 'Engineer' wherever used in this contract shall be George H. Knostman, Jr., or his duly authorized representative. Notices of any change in the Engineer shall be given in writing by the Owner to the Contractor. The Engineer shall have full authority to interpret the Plans and Specifications and shall determine the amount, quality, and acceptance of the work and sup-

plies to be paid for under this contract and every question relative to the fulfillment of the terms and provisions therein. \*\*\*

It shall be the duty of the Engineer to enforce the Specifications in a fair and unbiased manner, although he has the right to waive any term of the Specifications if that term is found to be unreasonable and inconsistent with the general spirit of the Specifications. \*\*\*

15. WAIVER. It is expressly understood and agreed that any waiver granted by the Engineer or the Owner of any term, provision or covenant of this contract shall not constitute a precedent nor breach of the same or any other terms, provisions, or covenants of this contract.

Neither the acceptance of the work by the Owner nor the payment of all or any part of the sum due the Contractor hereunder shall constitute a waiver by the Owner of any claim which the Owner may have against the Contractor or surety under this contract or otherwise.

\* \* \*

20. PAYMENT FOR WORK COMPLETED. Partial payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable on estimates made by the Engineer and as approved by the Owner, provided that the Contractor is performing the overall job in a diligent manner. \*\*\*

Upon the completion and acceptance of the work, the Engineer shall issue a certificate that the work has been completed and accepted by him under the conditions of this contract, and shall make and approve the final estimate of work. \*\*\*

\* \* \*

32. INSPECTION. The Engineer and his representative shall, at all times, have access to the work during its construction, and shall be furnished with every reasonable facility for ascertaining that the stock and materials used and employed, and the workmanship are in accordance with the requirements and intentions of the Specifications. \*\*\*

\*\*\*

The inspection of the work shall not relieve the Contractor of any of his obligations to fulfill his contract as prescribed, and defective work shall be made good and unsuitable materials shall be rejected, notwithstanding that such defective work and materials have been previously overlooked and accepted on estimates for payment. All work shall be tested to the satisfaction

of the Engineer before acceptance.
***

33. DEFECTIVE WORK OR MATERIAL. The Contractor shall promptly remove from the premises all work and materials condemned by the Engineer as failing to conform to the contract. ***
* * *

40. ACCEPTANCE. Final inspection and acceptance of the work shall be made for the Owner by the Engineer in collaboration with the Engineer for the Farmers Home Administration. Such inspection shall be made as soon as practical after the Contractor has notified the Owner in writing that the work is ready for such inspection.

41. FINAL ESTIMATES. Upon completion and acceptance of the work, the Engineer shall issue a certificate that the whole work provided for in this contract has been completed and accepted by him under the conditions and terms thereof and shall make the final estimate of the work. ***
***

43. MAINTENANCE OF SYSTEM. The Contractor shall, for a period of one year after completion and acceptance of work, repair at his expense any leak or other failures."

Plaintiff focuses on the second paragraph of article No. 15. Plaintiff states the following language is unambiguous and determinative of Azzarelli's affirmative defense:

"Neither the acceptance of the work by the Owner nor the payment of all or any part of the sum due the Contractor hereunder shall constitute a waiver by the Owner of any claim which the Owner may have against the Contractor or surety under this contract or otherwise."

Plaintiff argues this sentence expressly negates the claim of waiver by acceptance and payment. Therefore, acceptance is not a defense as a matter of law, and defendants are liable for all defects in construction—patent, as well as latent. Plaintiff moved for a directed verdict at the conclusion of all the evidence. The court denied the motion. Plaintiff argues the court should have directed a verdict and eliminated the affirmative defense of waiver by acceptance from the jury's consideration.

Plaintiff cites two cases for support. (*Board of Regents v. Wilson* (1975), 27 Ill. App. 3d 26, 326 N.E.2d 216; *Houston Fire & Casualty Insurance Co. v. Riesel Independent School District* (Tex. Civ. App. 1964), 375 S.W.2d 323.) In both cases, the courts examined a provi-

sion similar to the second sentence of article No. 15 as it related to a one-year guarantee of work and materials. The courts held the expiration of the one-year period did not eliminate the contractor's general obligation to perform in a workmanlike fashion. The one-year guarantee merely provided an additional contractual remedy for a one-year period. In *Houston Fire*, the court also discussed the effect of final payment and occupancy on a contractor's obligation to perform in workmanlike fashion. The court held the contract, when construed as a whole, did not prevent an owner from bringing claims against the contractor following final payment and occupancy. However, the defendant in *Houston Fire* did not rely on inspection and acceptance, nor did the opinion distinguish between patent and latent defects.

Azzarelli argues the trial court was correct in its rulings as it was simply following proper contract law. Azzarelli argues the court construed article No. 15 in the context of the entire contract. According to Azzarelli, Knostman had the authority, on behalf of plaintiff, to approve and accept the performance by Azzarelli. Thus, the thrust of article No. 15 was aimed at latent defects appearing after the expiration of the one-year guarantee. Azzarelli states this is in accord with the current state of the law in Illinois. See 12A Ill. L. & Prac. *Contracts* §454, at 318 (1983) ("[A]cceptance of the work or structure is not a waiver of proper performance, where the owner neither knows nor has reason to know of its defective nature and therefore does not constitute a waiver of latent defects of which the owner was ignorant at the time"); see also 13 Am. Jur. 2d *Building & Construction Contracts* §55 (1964).

Azzarelli supports its argument by citing to *Subsurfco, Inc. v. B-Y Water District* (S.D. 1983), 337 N.W.2d 448. In *Subsurfco*, a government water district filed a counterclaim against a contractor for breach of contract. The contractor had halted construction after serious defects appeared in a completed portion of a water distribution system. The contractor claimed the defects were so serious it could not effect repairs, and the defects were attributable to design errors. During construction, inspectors from the water district observed all aspects of the pipeline operation, and none of the work was rejected at the time it was performed. Under the contract, the engineer was to certify the work when the project had been substantially completed. The engineer was given the authority to deviate from the plans and specifications during construction, to order work uncovered for inspection, and to approve payments made to the contractor. Also, progress payments were made to the contractor. Each payment contained a representation from the water district project coordinator

that the work performed as of that date had been inspected and was constructed in accordance with the contract. The trial court refused to instruct the jury concerning the defense of waiver of the construction defects. The supreme court of South Dakota reversed because of the presence of the inspectors on the construction site, the ability of the engineer to modify the details of performance in the field, and the progress payments. The water district argued the applicability of a provision similar to article No. 15 of the contract in the instant case. However, the court held the water district could waive that contract provision as well. *Subsurfco*, 337 N.W.2d at 455-56.

Another case cited by Azzarelli is *City of Gering v. Patricia G. Smith Co.* (1983), 215 Neb. 174, 337 N.W.2d 747. *City of Gering* involved the construction of a sewer system for a municipal corporation. Following completion of the construction, the engineering company certified completion of the work and approved final payment, although one of its engineers had knowledge of a sag in a portion of the sewer line. The sag subsequently proved to be a serious problem that required correction. The city sued to recover the costs of repair. The court held the city had waived the defect because of the knowledge of the engineering company prior to issuing the certificate of completion. (*City of Gering*, 215 Neb. at 175-80, 337 N.W.2d at 749-51.) There is no discussion concerning a provision similar to article No. 15 of the contract in the instant case.

■ We conclude the trial court properly refused to grant plaintiff a directed verdict as to the affirmative defense of waiver by acceptance. We find the instant factual situation is more similar to the facts in *Subsurfco* and *City of Gering* than to the cases cited by plaintiff. The contract gave Knostman significant responsibilities for overseeing the construction of the sewer system. Article No. 14 gave Knostman the authority to "interpret" the plans and specifications, and to "determine the amount, quality, and acceptance of the work and supplies." Knostman was able to "waive any term of the Specifications if that term [was] found to be unreasonable and inconsistent with the general spirit of the Specifications." Under article No. 32, Knostman was given complete access to the project for purposes of inspecting the work and materials. Knostman was to prepare the payment estimates, including the final estimate upon completion of the work. He was also given the responsibility under article No. 40 of making the final inspection and giving final approval to the project. The evidence supports the fact that Knostman was an active supervisor, although it is disputed as to whether he examined *all* of the project before he approved it. Several individuals testified that Knostman was on the job

each day inspecting the work. He ordered deviations from the original plans on several occasions when obstacles, such as utilities, were encountered. Knostman prepared the payment estimates based on the progress of the project.

Under these circumstances, it would be manifestly unfair to permit plaintiff to recover for defects which Knostman approved and, perhaps, caused by alterations he required. The second sentence of article No. 15 cannot be construed to allow recovery against defendant for faults which Knostman ordered and approved. As to these faults, plaintiff waived any recovery from defendant.

■■ ■ On cross-appeal, Azzarelli takes its argument one step further. It argues it should have been granted a directed verdict or judgment notwithstanding the verdict because of Knostman's acceptance of Azzarelli's performance. Azzarelli argues Knostman's acceptance was absolutely binding on plaintiff in the absence of fraud or mistake, citing 13 Am. Jur. 2d *Building & Construction Contracts* §34 (1964). However, we note the same authority states the approval of the architect or engineer does not exempt a contractor for liability arising from latent defects. (13 Am. Jur. 2d *Building & Construction Contracts* §35 (1964).) Indeed, the second paragraph of article No. 15 appears to be addressed to just this situation. It states that neither acceptance of the work nor payment shall waive any claims against the contractor. In conjunction with the rest of the contract, this provision would preserve claims for latent defects but not for defects specifically approved by the engineer. While the record lends support to Azzarelli's position that a directed verdict should not have been granted *against* it on the issue of waiver, the record does not demand a directed verdict *for* Azzarelli. Plaintiff produced evidence that the defects were caused by poor workmanship and that it might take years for the full effect of the defects to appear. Thus, the record contains evidence that the sewer system was constructed with latent defects for which Knostman's acceptance would not bind plaintiff.

In sum, the court properly denied plaintiff's and Azzarelli's motions for directed verdicts. The contract granted Knostman supervisory responsibilities and permitted him to make changes in the field. The work that he required, inspected, and approved should not be made the basis for claims against Azzarelli. On the other hand, the contract, specifically articles Nos. 15 and 32, preserved claims for faulty workmanship. These types of claims include claims for latent defects. The evidence at trial was in dispute as to whether the defects in the sanitary sewer system were latent defects or defects of which Knostman had knowledge. Thus, the trial court properly permitted

the jury to be instructed concerning the affirmative defense of waiver by acceptance.

### BURDEN OF PROOF—JURY INSTRUCTION

Plaintiff argues the burden of proof instruction was erroneous because it was contradictory on the issue of waiver by acceptance. Also, plaintiff tendered two instructions on the principle of law concerning latent defects. The court refused both instructions. Plaintiff contends the court should have accepted at least one of the instructions.

The burden of proof instruction given by the court stated, in relevant part:

"The Plaintiff has the burden of proving each of the following propositions with reference to the complaint:

First: That Defendant, Azzarelli, breached the written contract between Plaintiff and Defendant, Azzarelli, in one of the ways claimed by Plaintiff as stated to you in these instructions.

Second: That Plaintiff, *in inspecting and accepting the performance of the Defendant,* Azzarelli, certain breaches were latent and it did not discover and could not have reasonably discovered, such latent breaches.

Third: That such latent breaches were one of those claimed by Plaintiff as stated to you in these instructions.

Fourth: That the Plaintiff sustained damages.

In this case the Defendant, Azzarelli, has asserted the affirmative defenses that:

1. Plaintiff inspected all the performance of the parties' written contract by Defendant, Azzarelli, and accepted all such performances;

\* \* \*

The Defendant, Azzarelli, has the burden of proving these defenses.

If you find from your consideration of all the evidence that each of the propositions required of the Plaintiff has been proved and that none of the Defendant's affirmative defenses have been proved then your verdict should be for the Plaintiff. If, on the other hand, you find from your consideration of all of the evidence that any one of the propositions the Plaintiff is required to prove has not been proved or that any one of the affirmative defenses has been proved, then your verdict should be for the Defendant, Azzarelli." (Emphasis added.)

Plaintiff argues the emphasized portion of the quoted instruction *required* the jury to find for defendants according to the first affirmative defense.

Paragraph "Second" of the instruction stated that plaintiff had inspected and accepted Azzarelli's performance. The first affirmative defense was based on the same two factors of inspection and acceptance. According to plaintiff, the jury instruction given by the trial court eliminated any possibility of recovery for even latent defects. Plaintiff believes it was simply lucky that the jury found for it on the issue of liability and awarded any damages at all.

Azzarelli responds by arguing the instruction was properly worded and not contradictory. Azzarelli argues the instruction clearly stated that plaintiff could recover for latent defects even though plaintiff had accepted and paid for Azzarelli's performance. In addition, Azzarelli points out the jury ignored the apparent contradiction and found for plaintiff on the issue of liability. Finally, Azzarelli argues the instruction tendered by plaintiff was improper. Plaintiff's instruction was the same as the court's except for one paragraph. Plaintiff's instruction would have substituted the following for paragraph "Second":

"Second: That Defendant, Azzarelli, by performing the contract in an unworkmanlike manner, caused defects in the system, and that Plaintiff did not discover and could not reasonably have discovered those defects at the time of the completion of the contract."

Azzarelli states that the issue of unworkmanlike performance was a disputed fact and, therefore, plaintiff's instruction was improper.

■ We conclude that no reversible error resulted from the use of the court's burden of proof instruction. The instruction clearly states that plaintiff should not be responsible for latent defects. The problem arises because of the language in paragraph "Second" that is similar to the first affirmative defense. However, any ambiguity was not such as to require reversal.

■ Plaintiff offered two additional instructions concerning latent defects. The court refused both instructions. Plaintiff argues this was error as he was entitled to instruct the jury on his theories of the case. However, the principle of law regarding latent defects was adequately covered in the burden of proof and issue instructions, and the court was not required to accept additional instructions on the matter. *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 452, 158 N.E.2d 63, 69; *Sloan v. O'Dell* (1987), 159 Ill. App. 3d 268, 274, 512 N.E.2d 105, 109-10.

DAMAGES

Plaintiff raises several allegations of error regarding the jury instruction on damages. Plaintiff tendered the following instruction on damages:

> "If you decide for the Plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate it for any of the following elements of damages proved by the evidence to have resulted from the breach of the Defendant:
>
> 1. The cost of repairs made to date by the Plaintiff, if any.
>
> 2. The cost of repairs which need to be made by the Plaintiff, if any.
>
> 3. Expenses incurred by the Plaintiff as a result of the breach, if any."

The court refused plaintiff's instruction and gave the following instruction from the Illinois Pattern Jury Instructions:

> "If you decide for the Plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate it for any of the following elements of damages proved by the evidence to have resulted from the breach of the Defendant:
>
> The reasonable expense of necessary repairs.
>
> Whether any of these elements of damages has been proved by the evidence is for you to determine." (See Illinois Pattern Jury Instructions, Civil, Nos. 30.01, 30.13 (2d ed. 1971) (IPI Civil 2d).)

The court stated the requested damages covered in points two and three of plaintiff's instruction could be argued to the jury. In closing argument, plaintiff detailed the nature and amount of damages he was requesting.

Plaintiff argues the court's instruction was flawed. Plaintiff states the court's instruction eliminated consideration for incidental and consequential damages. Plaintiff points to the engineering studies, including the various tests and inspections of the sewer system, as examples of incidental expenses. Also, plaintiff suggests the court's instruction was unclear as to whether the jury could have awarded damages for future repairs, as well as repairs performed to date. Finally, plaintiff argues the court erroneously refused a separate instruction stating that damages are to be computed as of the time of trial.

Azzarelli contends there was no evidence to support an instruction on incidental or consequential damages. Azzarelli argues the engineer-

ing expenses were unrelated to the alleged construction defects. In its cross-appeal, Azzarelli expounds on this theme. The court allowed plaintiff to enter into evidence receipts and cost estimates totalling over $1 million. Yet, the actual amounts expended for construction repairs were but a fraction of this sum. Azzarelli argues plaintiff was entitled to damages for the actual repair work performed, but not for incidental costs. Azzarelli concludes it was denied a fair trial because of erroneously admitted evidence of costs unrelated to construction defects. As relief, Azzarelli asks for judgment notwithstanding the verdict, or a new trial limited to the issue of liability only.

 We conclude the court properly exercised its discretion concerning the issue of damages and the preparation of a proper jury instruction on that issue. The proper measure of damages for a breach of a construction contract is the cost of correcting the defective conditions. If, however, the defects could be corrected only at a cost unreasonably disproportionate to the benefit to the purchaser or, if correcting the defects would entail unreasonable destruction of the builder's work, the amount by which the defects have reduced the value of the property should be the measure of damages. (*Park v. Sohn* (1982), 89 Ill. 2d 453, 464-65, 433 N.E.2d 651, 657; *Mayfield v. Swafford* (1982), 106 Ill. App. 3d 610, 613-14, 435 N.E.2d 953, 956.) As the court in *Mayfield* noted, this corresponds to section 348(2) of the Restatement (Second) of Contracts (1981). The general rule for breach of contract damages is found in section 347 of the Restatement (Second) of Contracts, and provides for damages as measured by:

"(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

(b) any other loss, including incidental or consequential loss, caused by the breach, less

(c) any cost or other loss that he has avoided by not having to perform." (Restatement (Second) of Contracts §347, at 112 (1981).)

Section 348 provides alternative rules for subpart (a), and it specifically includes the standard measure of damages used in construction contracts. (Restatement (Second) of Contracts §348 (1981).) The point of this discussion is that incidental or consequential damages are not necessarily excluded by using the alternative rule under section 348. Contrary to Azzarelli's assertion, the trial court was not in error for allowing evidence of damages alleged by plaintiff to be incidental to the actual cost of repairs.

 ██ We also find the court was correct in refusing plaintiff's instruction on damages. The court used the appropriate IPI Civil 2d

instruction and refused plaintiff's non-IPI instruction. Generally, the trial court has considerable discretion in determining the form in which an instruction shall be given. (*Ralston v. Plogger* (1985), 132 Ill. App. 3d 90, 98, 476 N.E.2d 1378, 1383.) A reviewing court will not reverse a trial court for erroneously refusing an instruction unless prejudice has resulted. (*Malek v. Lederle Laboratories* (1984), 125 Ill. App. 3d 870, 872, 466 N.E.2d 1038, 1039.) Generally, a jury should be given the applicable Illinois Pattern Jury Instruction. (*Duffin v. Seibring* (1987), 154 Ill. App. 3d 821, 831, 507 N.E.2d 930, 936.) As to the explanation of incidental and consequential damages, plaintiff's instruction was not in a form that would clearly explain the concept for the jury. The court's instruction, which followed the IPI, was preferable. In closing argument, plaintiff was allowed to argue for reimbursement of incidental costs and expenses. Thus, on balance, no prejudicial error occurred, such that a new trial is required.

 Also, plaintiff presented his projected damage estimates in current dollars and was not prejudiced by the failure to give an instruction mandating a damage award in current dollars. Moreover, the cases cited by plaintiff do not stand for the proposition that a jury *must* award damages in a sum equal to the current cost of repairs. Therefore, plaintiff's suggested instruction was not supported by law.

Plaintiff next argues the jury award was clearly inadequate, and the case should be remanded for a new trial on damages only. Plaintiff states that its estimate of over $1 million in required repairs was uncontradicted. Plaintiff summarized the costs as follows: $162,850 for repairing manholes; $11,612 for eliminating the running trap; $778,300 as the projected cost of a relief sewer; $11,467.50 for the television inspection by W.J. Jaques Company; $26,680.75 for flow studies and other expenses of Edward Campbell; $70,591.43 for engineering services and expenses incurred by Nathan Wilcoxon and the firm of Crawford, Murphy & Tilly; for a total sum of $1,061,501.

 ██ Just as the court gave plaintiff considerable latitude in submitting receipts and cost estimates for repairs, defendants were similarly allowed great latitude in probing the nature of these expenses. Every cost submitted by plaintiff was challenged as to whether it actually related to repairs, or to other factors. On cross-examination, defendants elicited the fact that several of the engineering studies were also required by the IEPA; that some of the repairs could be described as resulting out of a change in design rather than a correction of defective construction work; and that the projected relief sewer would result in a water flow capacity many times greater than the system designed by Knostman and built by Azzarelli. Fur-

ther, defendants challenged the cause of the defects and argued the problems were not caused by faulty construction. The question of damages is peculiarly one of fact for the jury. (*Montgomery v. City of Chicago* (1985), 134 Ill. App. 3d 499, 502, 481 N.E.2d 50, 53.) Generally, the amount of damages awarded by the jury will not be overturned unless it is palpably inadequate or against the manifest weight of the evidence. (*Montgomery*, 134 Ill. App. 3d at 502, 481 N.E.2d at 53.) In this case, the evidence as to damages was seriously disputed and properly left for the jury to determine.

### AZZARELLI'S REMAINING AFFIRMATIVE DEFENSES

 Plaintiff argues the court erred in refusing to direct verdicts for plaintiff on Azzarelli's four remaining affirmative defenses. Two of the defenses were abandoned by Azzarelli, and the jury was not instructed as to them. We need not discuss them either. The jury was instructed concerning the following two affirmative defenses:

"2. Plaintiff failed to inform Defendant, Azzarelli, of any deficiencies in its performance and afford the Defendant, Azzarelli, an opportunity to correct such deficiencies and thereby waive such deficiencies.

3. Plaintiff failed to mitigate its damages in failing to notify the Defendant, Azzarelli, and afford Defendant, Azzarelli, an opportunity to correct such deficiencies."

Plaintiff argues these defenses were not supported by the record or applicable law. Therefore, directed verdicts should have been granted. Regarding the trial evidence, plaintiff argues that no evidence was offered concerning interference with Azzarelli's attempts to investigate defective work or material. Azzarelli responds that plaintiff made certain repairs between 1975 and 1979, of which Azzarelli had no notice. Therefore, Azzarelli concludes it had no chance to investigate those problems and determine if it was responsible. The record supports Azzarelli's assertion. Azzarelli was not contacted about problems of excessive inflow and infiltration between 1975 and 1979 when plaintiff filed its complaint.

As for legal principles, plaintiff argues it was under a duty to make any repairs it could to minimize losses under the doctrine of avoidable consequences. Plaintiff contends that the affirmative defenses, as stated, forbid plaintiff from mitigating its damages. However, this is a misstatement of the defenses. Article No. 33 of the contract required Azzarelli to replace all defective work and remove all defective materials. Therefore, the contract obligated plaintiff to inform Azzarelli of the existence of defects. Plaintiff was not entitled to

directed verdicts as to these defenses.

### FRAUD

At the close of plaintiff's case, the court directed verdicts for defendants on all counts but count III, the breach of contract claim. The court eliminated plaintiff's claims for breach of fiduciary duty, fraud, and conspiracy to breach fiduciary duties. Plaintiff argues the court's rulings were in error as plaintiff had produced evidence of these claims. The basis of these three claims was that Knostman prepared false payment estimates in collusion with Azzarelli, and submitted the estimates to the village board. The estimates were allegedly false because Azzarelli failed to perform in a workmanlike manner and Knostman had not examined the work prior to preparing the estimates.

Plaintiff discusses the following evidence as support for its fraud claims. First, plaintiff states that Azzarelli made repairs to certain manholes by simply plastering over the defects. Several years later, the plaster came off, and the manholes leaked. Second, under article No. 39 of the contract, Azzarelli was responsible for anticipating all underground utility obstructions, such as storm sewers. Azzarelli was responsible to bear any added costs for circumventing these obstructions. At one point during construction, the path of the sanitary sewer crossed that of a storm sewer. Knostman gave his opinion to the village board that plaintiff would have to pay the cost of rerouting the storm sewer. As an alternative, Azzarelli offered to construct a temporary bypass, the running trap. The village accepted the offer, and the running trap was constructed at no extra cost. Plaintiff alleges this was evidence of conspiracy to defraud it. Third, plaintiff alleges that Knostman actually viewed less than one-half of the sewer pipes as they were laid in the ground, and that many of the pipes were covered before Knostman could inspect them. According to plaintiff, this is evidence of a breach of fiduciary duties as each pay estimate contained an implied representation that the work had been properly inspected. Further, plaintiff alleges that Knostman must have known the overall construction was defective because "the whole system began to leak like a sieve a few years later."

■■■ Azzarelli argues there is no evidence that it was engaged in fraudulent activity. We agree. Plaintiff has not produced sufficient evidence to support its claims for fraud. Fraud is never presumed but must be proved by clear and convincing evidence. (*Ray v. Winter* (1977), 67 Ill. 2d 296, 303, 367 N.E.2d 678, 682.) The evidence plaintiff relies on creates nothing more than mere suspicion. For this rea-

son, the trial court was not in error in directing verdicts on these three fraud claims.

 Plaintiff also claims error concerning count VII, the cause of action under the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1987, ch. 121½, pars. 261 through 272). After the complaint was filed, Azzarelli filed motions to dismiss all counts against it. The court denied the motions except as to count VII. Count VII was dismissed. On appeal, plaintiff argues it was a proper party to bring a cause of action under the Act. However, we need not respond to this argument. As the court dismissed the other claims relating to fraud, so, too, the court would have dismissed this cause of action. By the time the jury was instructed, the court had narrowed plaintiff's allegations into one breach of contract claim against Azzarelli. Our courts have held that the Act should not apply to simple breach of contract claims. (*Grass v. Homann* (1984), 130 Ill. App. 3d 874, 880, 474 N.E.2d 711, 715; *Exchange National Bank v. Farm Bureau Life Insurance Co.* (1982), 108 Ill. App. 3d 212, 215, 438 N.E.2d 1247, 1250.) Any error in dismissing count VII was harmless as plaintiff did not meet its burden of proof regarding fraud at trial.

### EVIDENTIARY ERRORS

Plaintiff argues the court allowed Fidelity to violate the collateral source rule in its cross-examination of Nathan Wilcoxon. Defendants respond that the cross-examination was proper in order to show bias.

 Wilcoxon, one of plaintiff's expert witnesses, testified on direct examination as to his opinion regarding the cause of plaintiff's excessive inflow and infiltration. Wilcoxon's opinion was that 75% of the problem stemmed from defects in the sewer system, and the remaining 25% was from other sources, including residential service connections. On cross-examination, Fidelity questioned Wilcoxon regarding the tests Wilcoxon made to the sewer system. Wilcoxon testified he did no tests on residential service connections. One of the reasons for not exploring residential service connections is that such tests are not cost efficient under IEPA standards. IEPA provides funds for cost efficient rehabilitation. IEPA does not provide funds for rehabilitating sloppy residential service connections. Defendants argued to the trial court that Wilcoxon had a motive for finding fault with the sewer system as opposed to the private service connections. If the sewer system was at fault, government funding could be received to defer the cost of rehabilitation. The court allowed the inquiry by Fidelity's counsel. We find the inquiry was properly aimed at the potential bias involved in Wilcoxon's engineering studies.

Finally, plaintiff suggests other errors occurred which were not reversible errors, but should be corrected in the event of a remand for a new trial. We agree the errors are not reversible. Since we are affirming the judgment of the circuit court in its entirety, we need not consider these errors.

For the reasons stated above, the order of the circuit court of Sangamon County is affirmed.

Affirmed.

McCULLOUGH, P.J., and GREEN, J., concur.